UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

CIVIL ACTION NO. 3:21-CV-00012-EBA

KEVIN GLOWGOWER, *et al.*,                                                                 PLAINTIFFS,

V.         **MEMORANDUM OPINION & ORDER**

MELISSA BYBEE-FIELDS, *et al.*,                                                          DEFENDANTS.

*** *** *** ***

### I. INTRODUCTION

On July 28, 2022, Defendant Melissa Bybee-Fields, sued in her official capacity as Chief Clerk of the Kentucky House of Representatives ("Chief Clerk"), moved to dismiss the Plaintiffs' Complaint. [R. 58]. The Plaintiffs responded, [R. 59], and the Chief Clerk replied. [R. 60]. Upon review of the motion and the Complaint, the Court entered an Order (1) finding that purely legal questions are presented, and (2) reminding the parties that this is a pre-enforcement action. [R. 78]. Consequently, the Court cancelled the jury trial and directed the parties to file briefs on four issues, including pre-enforcement standing. [*Id.*]. In that same Order, the Court took the Chief Clerk's motion to dismiss under advisement. [*Id.*]. In accord with the Court's Order, Plaintiffs and the Chief Clerk filed their briefs on October 14, 2022. [R. 79]; [R. 80]. This matter is ripe for adjudication.

### II. FACTS AND PROCEDURAL HISTORY

In January 2021, three sets of petitioners petitioned the Kentucky General Assembly to impeach three different elected officials—Governor Andy Beshear, Attorney General Daniel

Cameron, and Representative Robert Goforth. The Beshear Petition—filed by the Beshear Plaintiffs, Andrew Cooperrider, Tony Wheatley, and Jacob Clark (who are no longer parties to this action)—"was supported by dozens of other Kentucky residents as affiants, and approximately another 100,000 Kentucky residents submitted supporting petitions." [R. 1 at ¶ 12]. The Goforth Petition—filed by the Goforth Plaintiffs, Michael and Carol VanWinkle—"was supported by approximately a dozen other Kentucky residents." [*Id.* at ¶ 13]. The Cameron Petition—filed by the Cameron Plaintiffs, John Does 1–3, through their counsel, Kevin Glogower[1]—was filed "with another affiant and Jennifer Smith[.]" [*Id.* at ¶ 14].

A month later—in February 2021—"all three petitions were dismissed. All of those dismissals indicated an intention to tax the 'costs of the investigation' to the Petitioners in all three petitions, which included attorney and expert fees." [*Id.* at ¶ 15]. The Governor promptly "submitted a cost bill application to the Impeachment Committee, seeking, among other things, that . . . the Committee . . . award these costs pursuant to KRS 63.070, and to order the remaining [Beshear] Petitioners to reimburse the Commonwealth for these expenses." [*Id.* at ¶ 16]. The Attorney General took no action, "perhaps recognizing the significant First Amendment issues associated with taxing costs against people for the exercise of First Amendment rights[.]" [*Id.* at ¶ 17]. Seemingly, Representative Goforth followed the Attorney General's lead and took no action.

Another month later—in March 2021—"the Kentucky House Impeachment Committee sent a letter to the Beshear Petitioners and Plaintiffs, . . . the Cameron Petitioners and Plaintiffs, . . . [and] the Goforth Petitioners and Plaintiffs, indicating their intention to impose significant fees and costs on these Petitioners[.]" [*Id.* at ¶¶ 19–21]. For the Beshear Petitioners, the costs totaled

---

[1] Kevin Glogower's name was misspelled in the Complaint as "Glowgower," hence the misspelled caption of this case. [R. 1].

$42,444.05. [*Id.* at ¶ 19]. The Cameron Petitioners faced costs of $7,597.36. [*Id.* at ¶ 20]. And the Goforth Petitioners were assessed costs totaling $12,457.36. [*Id.* at ¶ 21]. In the letters, the Impeachment Committee "indicated that they would not entertain any objections or argument about the imposition of these fees or costs generally, and thus indicating they will not entertain arguments about the constitutionality of such fees." [*Id.* at ¶ 19]. Thus, Plaintiffs assert that they "have exhausted their remedies." [*Id.* at ¶ 22]. At the time this suit was filed, and to date, "there has been no filing in state court to seek to enforce any cost of investigation, and, further, no final costs of investigation under K.R.S. 63.070 have been determined or assessed." [*Id.* at ¶ 23].

All three groups of impeachment petitioners sued Governor Beshear and the Chief Clerk in this single action. [R. 1]. At the onset, Plaintiffs filed an emergency motion for a temporary restraining order to block the Chief Clerk from taxing costs and fees during the pendency of this action and moved for a preliminary injunction to prevent her from enforcing KRS § 63.070. [R. 3]. The Court denied Plaintiffs' emergency motion for a temporary restraining order "because . . . the requirements of Rule 65 [were] not satisfied[,]" but the Court continued its analysis of Plaintiffs' motion for a preliminary injunction until a scheduling conference could be held and additional briefing filed. [R. 11 at pg. 5]. On December 17, 2021, the Court granted Governor Beshear's motion to dismiss the action for lack of subject matter jurisdiction, [R. 18], because he did not "commit[] an action giv[ing] rise to a ripe claim." [R. 27 at pg. 6]. In that Order, the Court distinguished between the actions of the Governor and those of the House Clerk. The Court found that the Governor never "made clear his intention to seek [KRS § 63.070's] enforcement[,]" but noted that "[t]his is unlike the actions of the House Clerk, who, only by proposed agreement of the Parties, has agreed to 'not tax costs related to the impeachment petitions' until 'the conclusion of

all litigation' in this matter." [*Id.* at pg. 6 n.5]. At this moment, the Chief Clerk became—and continues to be—the only defendant.[2]

Following the Governor's dismissal, the Beshear Plaintiffs reached an agreement to settle their claims with the Chief Clerk and submitted a proposed agreed order to the Court for consideration. [R. 35]. The Chief Clerk agreed to "not tax costs against [the Beshear Plaintiffs]," without making any "concession as to the merits of the petitions or any admission of liability[,]" in exchange for the Beshear Plaintiffs to "dismiss and withdraw their claims[.]" [*Id.*]. On February 24, 2022, the Court granted the proposed order. [R. 37]. At this stage, the Cameron and Goforth Petitioners became—and continue to be—the only plaintiffs.

The remaining Plaintiffs and the Chief Clerk reached an agreement as to Plaintiffs' then-pending motion for a preliminary injunction and memorialized it in the record. [R. 36]. The Court granted the proposed agreed order, which directs the Chief Clerk to "hold taxing of fines or costs against the [Cameron and Goforth Petitioners] [. . .] during the pendency of this action[,]" in exchange for the Plaintiffs to "hold any request for injunctive relief [. . .] in abeyance." [R. 39] (modifications in original).

Most recently, the Chief Clerk moved to dismiss this action for lack of subject matter jurisdiction and failure to state a claim. [R. 58]. After the Plaintiffs responded and the Chief Clerk replied, the parties attempted to resolve their claims in a settlement conference. [R. 74]; [R. 75]. The parties were unable to resolve the matter. [R. 77]. The same day, the Court determined that the Plaintiffs solely raise legal issues in their Complaint and that additional briefing is necessary to resolve the Chief Clerk's motion to dismiss. [R. 78]. The parties filed their supplemental briefs. [R. 79]; [R. 80]. This matter will now be resolved on the briefs.

---

[2] Plaintiffs' counsel frequently refers to "the Defendant House" as a named party, as opposed to the "Chief Clerk." *See*, *e.g.*, [R. 59 at pgs. 1–3, 6, 7]. But, as the Chief Clerk notes, the only named Defendant in this action is the Chief Clerk. [R. 1; R. 27].

### III. LEGAL STANDARD

Rule 12(b) governs the motion to dismiss vehicle. FED. R. CIV. P. 12(b). A claim must be dismissed for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). A defendant may assert lack of subject matter jurisdiction as a defense at any time. *Ambrose v. Welch*, 729 F.2d 1084, 1085 (6th Cir. 1984). A motion to dismiss under Rule 12(b)(1) is different from a motion to dismiss under Rule 12(b)(6) because it challenges the Court's authority to hear the case before it. When jurisdiction is challenged under this rule, the burden is on the claimant to prove that jurisdiction exists. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). There are two categories of motions to dismiss for lack of subject matter jurisdiction: facial attacks and factual attacks. "A *facial* attack is a challenge to the sufficiency of the pleadings itself. On such a motion, the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (internal citations omitted) (emphasis in the original). "A *factual* attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction. On such a motion, no presumptive truthfulness applies to the factual allegations and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (internal citations omitted) (emphasis in the original).

Failure to state a claim upon which relief may be granted, likewise, may result in dismissal. FED. R. CIV. P. 12(b)(6). When moving under Rule 12(b)(6), "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 433 (6th Cir. 2008). "That is not to say that the movant has some evidentiary burden; . . . evidence . . . is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of explanation: since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under

the circumstances—why dismissal is appropriate for failure to state a claim." *Santoni v. Miller*, U.S. Dist. LEXIS 4336, at *13–14 (M.D. Tenn. Jan. 10, 2022). When a motion to dismiss under Rule 12(b)(6) is filed, the Court must "construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true." *Laborers' Local 265 Pension Fund v. iShares Trust*, 769 F.3d 399, 403 (6th Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### IV. ANALYSIS

Here, the Court is tasked with determining whether the Plaintiffs are entitled to injunctive relief, declaratory relief, or both. [R. 78] (concluding that "this matter will be resolved on well-drafted, focused, and succinct legal briefs."). However, before reaching the merits of their request, the Court must first consider the Chief Clerk's fully briefed motion to dismiss, which raises three issues: whether (1) the Plaintiffs enjoy standing, (2) the Plaintiffs' claims are ripe, and (3) the Plaintiffs' Complaint sets forth a plausible claim to relief. [R. 58]; [R. 59]; [R. 60].

The Chief Clerk moves for dismissal of this matter, in part, under the justiciability doctrines of standing and ripeness pursuant to Rule 12(b)(1). [R. 58]. When a Rule 12(b)(1) motion is filed with other Rule 12 motions, the court should first consider the jurisdictional attack.[3] *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction[.]").

### A.

In her Motion to Dismiss, the Chief Clerk leans heavily on the "injury in fact" standing requirement. *See generally* [R. 58-1 at pgs. 5–8]. She flatly asserts that "the Plaintiffs fail to allege

---

[3] The Court addressed the political question doctrine *sua sponte* in an earlier Order, finding "no political question." [R. 78 at pg. 4–5 n.3].

. . . an injury in fact[,]" [*Id.* at pg. 6], and describes their claims as "theoretical," [*Id.*], and "hypothetical," [*Id.* at pg. 7]. For support, the Chief Clerk highlights that she "has undertaken no efforts to tax or collect the costs at any time" during the "sixteen (16) months since the end of the impeachment proceedings." [*Id.*].

In response, the Plaintiffs point to KRS § 63.070's mandatory language: "the petitioner [of a failed impeachment action] **shall** be liable to witnesses and to the accused for the costs of investigation before the committee." KRS § 63.070(1) (emphasis added). The Plaintiffs remark that the Chief Clerk never explains—nor attempts to explain—"why" or "how" "the costs may never be enforced," given "the mandatory language in KRS 63.070: 'These costs **shall** be taxed by the clerk.'" [R. 59 at pg. 7] (original emphasis). The Plaintiffs conjectured that "[t]he source of the Clerk's claimed power to ignore mandatory statutes . . . remains undisclosed, but presumably derives from the political wishes of her employers."[4] [*Id.*]. Also, the Plaintiffs argue that, "[e]ven assuming that the present House Clerk forbears executing this statutory directive, a future Clerk might understand her duties differently, and so the Plaintiffs could remain liable 'on 5 days notice' long beyond the tenure of the present officials." [*Id.*]. In short, the Plaintiffs contend that they suffer from an ongoing, imminent threat of enforcement that cannot be alleviated without judicial intervention—in other words, that there is a valid case or controversy for this Court to redress. *See McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016).

In reply, the Chief Clerk doubles down on the fact that she did not do anything to aggrieve the Plaintiffs. *See* [R. 60 at pg. 2] ("the Clerk has taken no action against any of the Plaintiffs herein."); [*Id.* at pg. 3] ("in this case the Clerk has taken absolutely zero action related to the

---

[4] The Court will disregard the Plaintiffs' unnecessary political speculation. As the Plaintiffs note in their Complaint, at the onset of this case, "there [were] three groups of Plaintiffs in this matter, constituting registered Republicans and Democrats. They could not disagree with each other more about the substance of what each group sought through their petitions, and yet they collectively agree on the importance of the rights at issue in this case. The rights at issue are non-partisan, ancient, and fundamental." [R. 1 at pg. 3].

Plaintiffs. . . . [T]he Plaintiffs do not even allege [the Clerk] has taken any action against them. . . Again, the Clerk has taken no action against any Plaintiff[.]"). But when faced with an imminent threat of—as opposed to a previously inflicted—injury, bare assertions like the Chief Clerk's are unpersuasive. Still, neither the Chief Clerk nor Plaintiffs adequately addressed pre-enforcement standing in their briefs on the Chief Clerk's motion to dismiss, so the Court ordered additional briefing on the issue. [R. 78]. Now that the briefs are in, the Court will consider whether the Court has jurisdiction to hear this matter. [R. 79]; [R. 80].

**B.**

Although the Chief Clerk does not specify whether her Rule 12(b)(1) motion is a facial or factual attack on the Court's subject matter jurisdiction, the Court construes it as a facial one. The Chief Clerk does not attack the facts underlying the Plaintiffs' assertion of subject matter jurisdiction. Rather, the Chief Clerk asserts that the Plaintiffs' facts as pled do not support a finding of subject matter jurisdiction.[5] *See*, *e.g.*, [R. 58-1 at pgs. 3–4] ("Notably, the Plaintiffs' Complaint states that '[a]s of the date and time that this matter has been filed, there has been no filing in state court to seek to enforce any cost of investigation. Additionally, the Complaint does not contain a single factual allegation that the Clerk has taken any action related to the Plaintiffs' impeachment petitions or against the Plaintiffs themselves at all."). Accordingly, "the court must take the material allegations of the petition as true and construed in the light most favorable to the" Plaintiffs. *Ritchie*, 15 F.3d at 598.

---

[5] On the other hand, a *factual* attack would challenge the Plaintiffs' account of the facts. This is an important distinction, as, in the Rule 12(b)(1) context, the Court is only empowered to resolve factual disputes when subject matter jurisdiction is at issue and the parties flatly disagree on the facts underlying the Plaintiffs' assertion of subject matter jurisdiction. That is not the case here, so the Court is not empowered to interpret the facts as it sees fit to resolve the question of subject matter jurisdiction. Rather, as with a Rule 12(b)(6) motion, the Court will accept the factual allegations in the Complaint as true.

The jurisdiction of Article III courts is limited to certain "Cases" and "Controversies." U.S. CONST. art. 3 § 2. Standing is one of four justiciability doctrines utilized by courts to ensure that only such cases and controversies are considered by federal courts.[6] "The doctrine of standing gives meaning to these constitutional limits by 'identif[ying] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Historically, a claimant enjoyed standing if he "had a cause of action and a 'legal right' or 'legal interest' sufficient to ground the suit."[7] ADRIAN VERMEULE, COMMON GOOD CONSTITUTIONALISM 177 (2022). During the last century, however, our standing jurisprudence underwent a seismic shift. Now, to enjoy standing a claimant must show an "'injury in fact' that is 'fairly traceable to the challenged action of the defendant' and is capable of being 'redressed' by the court." *McKay*, 823 F.3d at 867 (quoting *Lujan*, 504 U.S. at 560).[8]

The injury in fact requirement ensures that the claimant has a "personal stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal quotation marks omitted). A claimant shows injury in fact when the injury alleged is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper v. Amnesty International USA*, 568 U.S. 398, 408 (2013)).

---

[6] Standing "goes to [a c]ourt's subject matter jurisdiction." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007). Subject matter jurisdiction does not exist without constitutional standing. *Id.*

[7] "As an interpretation of Article III, that view was long-standing, equally consistent with the language, and compatible with the common good, insofar as it allowed legislatures to specify and determine rights to use in accordance with the public interest, treating individual claimants as delegates and representatives of the common good." VERMEULE at 177.

[8] "Until roughly the 1970s, the 'injury in fact' test in its current signification was no part of our law." VERMEULE at 177.

"One could imagine a court system that prevented a party from challenging a law unless the law had already been enforced against that party. If no enforcement, then no injury, so no case or controversy. But that is not our system." *Chelsey Nelson Photography LLC v. Louisville/Jefferson County Metro Gov't*, 479 F.Supp.3d 543, 549–50 (W.D. Ky. 2020). In our system, claimants are permitted and encouraged to bring pre-enforcement actions when constitutional rights are implicated. When "threatened action by government is concerned," the standing doctrine "do[es] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128–29 (2007). Therefore, the Plaintiffs enjoy standing to bring a pre-enforcement challenge to KRS § 63.070 if they allege that "(1) [they] intend[] to act in a way that implicates constitutional rights; (2) the provision prohibits what [they] intend[] to do; and (3) [their] intended actions raise 'a credible threat of prosecution' under" KRS § 63.070. *Chelsey Nelson Photography*, 479 F.Supp.3d at 550 (quoting *Susan B. Anthony List*, 573 U.S. at 159)).

### C.

Since all three elements are required to show pre-enforcement standing, the Court will consider each element in turn.

1. **The Plaintiffs' actions implicate constitutional rights.**

The Plaintiffs easily clear the first hurdle. Without doubt, their actions implicate constitutional rights. In chief, the Plaintiffs point to the First Amendment, which recognizes the people's right to petition the government for a redress of grievances. [R. 1 at ¶¶ 47–50]; *see* U.S. CONST. amend. I ("Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the government for a redress of grievances"). Further, the Plaintiffs claim that KRS § 63.070 breaches the First Amendment's free speech clause as both a content-

based and viewpoint-based restriction on speech.[9] [R. 1 at ¶¶ 51–56]. The Plaintiffs also point to the First Amendment's free association clause, [R. at ¶ 57], and the Fourteenth Amendment's equal protection clause, [R. 1 at ¶ 58].

The Commonwealth of Kentucky, by its own volition, extends the right of the people to petition their government to matters of impeachment.[10] *See* KRS § 63.070. Without question, the Plaintiffs' actions implicate the First Amendment's petition clause. Even more, because "[p]etitions are a form of expression, and [people] who invoke the Petition Clause in most cases could invoke as well the Speech Clause of the First Amendment[,]" the Plaintiffs' actions also implicate the First Amendment's speech clause. *Borough v. Duryea v. Guarnieri*, 564 U.S. 379, 382 (2011); *see Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220, 1226 (6th Cir. 1997). And since the Constitution protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion"—the Court similarly finds that the Plaintiffs' actions sufficiently implicate the First Amendment's free association clause.[11] *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984).

Accepting the facts in the Complaint as true, as the Court must, only a select few of the original impeachment petitioners—those who are Plaintiffs in this action—were ever mailed letters assessing costs for the failed impeachment effort. *See, e.g.*, [R. 1 at ¶ 13] ("Plaintiffs Michael and Caron[sic] VanWinkle . . . submitted a petition . . . requesting redress of injuries and the remedy of the impeachment of State Representative Robert Goforth . . . . *This petition was supported by*

---

[9] The way the Plaintiffs see it, KRS § 63.070 discriminates based on viewpoint: "[t]hose who submit petitions in favor of impeachment are penalized; those who submit petitions opposing impeachment are not." [R. 1 at ¶ 53].
[10] While the Chief Clerk disputes the merits of the Plaintiffs' petition clause argument, the Chief Clerk seems to concede that the petition clause is at least implicated. *See* [R. 80 at pg. 9].
[11] The Chief Clerk, too, concedes this point. [R. 80 at pg. 10].

*approximately a dozen other Kentucky residents*.") (emphasis added). Accordingly, the Plaintiffs' actions sufficiently implicate the Fourteenth Amendment's equal protection clause.

Certainly, the Plaintiffs acted in a way that implicates constitutional rights. So far, so good.

## 2. KRS § 63.070 does not prohibit any action.

Next, for Plaintiffs to show pre-enforcement standing, KRS § 63.070 must "proscribe," *Susan B. Anthony List*, 573 U.S. at 159, or "prohibit," *Chelsey Nelson Photography*, 479 F.Supp.3d at 550, their conduct.[12] "In our analysis, we start, as always, with the language of the statute."[13] *United States v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019) (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000) (cleaned up). The Court should generally decline invitations to "travel . . . beyond the borders of the statute" in its "search for the meaning of the lawmakers[.]" *United States v. Great Northern Ry.*, 287 U.S. 144, 154 (1932); *cf.* DIG. 32.1.69 (Ulpian, Trusts 1) ("The ordinary signification of words in a will must never be departed from, unless it is evident that the intention of the testator was otherwise."). So, to make this determination, we need only read KRS § 63.070:

> (1) In a proceeding for impeachment or removal by address, if the committee reports against the petition and the report is not overruled by the house petitioned, the petitioner shall be liable to witnesses and to the accused for the costs of investigation before the committee. These costs shall be taxed by the clerk of the house appointing the committee.
> (2) In an impeachment proceeding prosecuted before the Senate, if the accused is acquitted the petitioner shall pay the costs of the accused; and if the accused is convicted, he shall pay the petitioner the costs incurred on behalf of the prosecution. Costs mentioned in this subsection shall be taxed by the clerk of the Senate.

---

[12] To proscribe is "to condemn or forbid as harmful or unlawful," whereas to prohibit is "to forbid by authority." *Compare Proscribe*, MERRIAM-WEBSTER DICTIONARY ONLINE (last accessed Oct. 28, 2022), *with Prohibit*, MERRIAM-WEBSTER DICTIONARY ONLINE (last accessed Oct. 28, 2022); *see also United States v. Bedford*, 914 F.3d 422, 427–28 (6th Cir. 2019) (relying on the Merriam-Webster Dictionary Online to discern "the plain meaning of 'assist'").

[13] Generally, when "language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004); *see* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 69 (2012) ("Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense."); *cf.* JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 157–58 (1883) (noting that "every word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it").

> (3) Costs taxed pursuant to this section may be recovered on motion, after five (5) days' notice, in a Circuit Court.

Without doubt, the statute neither proscribes nor prohibits action. In fact, it does exactly the opposite. On its face, KRS § 63.070 provides Kentuckians with a statutory right to participate in the impeachment process and lays out a scheme for doing so.[14] That is all it does. *See* [R. 80 at pg. 5] (noting that "the conduct the Plaintiffs participated in, filing impeachment petitions, is not proscribed by statute at all, but rather is authorized by a statute, which is the only source of authority for them to file the petitions"). For the Court to read the statute in the way the Plaintiffs propose, that is, to find that the statute prohibits their conduct, the Court would "exercise will instead of judgment[.]" THE FEDERALIST NO. 78 (Hamilton) (original emphasis omitted); *see* WILLIAM BLACKSTONE, 1 COMMENTARIES ON THE LAWS OF ENGLAND 62 (4th ed. 1770) (noting that "law, without equity, though hard and disagreeable, is much more desirable for the public good, than equity without law: which would make every judge a legislator, and introduce most infinite confusion"). Instead, the Court "must declare the sense of the law[.]" THE FEDERALIST NO. 78.; *see also* CODE JUST. 1.14.5 (Constantine 425).[15]

Sure, KRS § 63.070 provides for the costs of investigation and prosecution of impeachment petitions to be taxed upon the petitioner in the event his petition is reported against in the House, or, if prosecuted before the Senate, the accused is acquitted. KRS § 63.070(1)–(2); *see* [R. 27 at pg. 1] ("In the *Aeneid*, Roman poet Virgil prescribed 'fortune favors the bold.' But Virgil, it appears, did not anticipate KRS § 63.070.") (quoting Virgil, *Aeneid*, 10.284). However,

---

[14] The Commonwealth of Kentucky recognizes that impeachment is undoubtedly "a concern for the public good" despite its "political undercurrents," so it invites the public to participate in the process via statute. Legislative Research Comm'n, Impeachment in Kentucky, Informational Bulletin No. 176, at 2 (1991). This statutory scheme seems unique to the Commonwealth. Still, this is fitting, as "[t]he laws of every people governed by statutes and customs are partly peculiar to itself, partly common to all mankind." J. INST. 1.2.1.

[15] When it comes to the language of a statute, Constantine counsels against parties "frequently and fraudulently taking advantage of its words" in an attempt to "destroy its spirit[.]" CODE JUST. 1.14.5 (Constantine 425). Consequently, he concludes that it is "sufficient for a legislator merely to have prohibited what he did not wish to be done; and that it is permitted to ascertain other matters from the intention of the law, just as if they had been expressed[.]" *Id.*

these provisions presumably accompany Kentucky's statutory right to participate in the impeachment process because "a privately available petition process all but invites scurrilous or specious claims." Shawn D. Chapman, *Removing Recalcitrant County Clerks in Kentucky*, 105 KY. L. J. 261, 284 (2016). The inclusion of such provisions, alone, cannot possibly intend to "proscribe" or "prohibit" conduct.

In sum, when it comes to the second prong of the pre-enforcement analysis, what matters most is what the statute says. KRS § 63.070 grants a right, it does not prohibit action. Specifically, the statutory scheme invites the public to petition the House to impeach a public official, no matter how frivolous. The petitioners may be subject to reasonable costs for doing so.[16] *See* [R. 58-1 at pg. 7] ("In the present case, the Plaintiffs seek to prevent the imposition of costs to recoup public money spent investigating their failed petitions for impeachment."). But imposing such costs does not serve to "prohibit" or "proscribe" any petitioner from filing an impeachment petition. Without any prohibited action, it is impossible for the Plaintiffs to show pre-enforcement standing. So, the Court need not continue the pre-enforcement analysis. *See Hightower v. City of Grand Rapids*, 256 F.Supp.3d 742, 748–54 (W.D. Mich. 2017) (concluding that the plaintiff lacked standing, without analyzing all three prongs, because he did not allege an injury in fact); *McKay*, 823 F.3d at 871 (same, except for failure to "show[] a credible threat of prosecution, with the manner and degree of evidence required to withstand summary judgment").

## D.

Despite this being a pre-enforcement action, in the absence of pre-enforcement standing, the Plaintiffs assert that they satisfy the traditional standing requirements. [R. 79 at pgs. 2–3]. "To

---

[16] It may be true that "a private party proceeding by petition faces substantial risk of paying costs at almost every step," and that "the chances of a successful petition are low, . . . [and] the chances of being forced to pay costs are high[,]" but the Court's analysis is unaffected. Chapman at 284. *See id.* at 283 n.172 (recounting the impeachments of (1) Ward "Butch" Burnette, (2) Judge "Honest Dick" Tate, (3) County Judge J.E. Williams, (4) Thomas Jones, (5) Elijah Craig, (6) William C. Rogers, (7) John A. Duff, and (8) Judge Benjamin Sebastian).

establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). Put simply, to have standing, a plaintiff must show: (1) an actual or imminent injury in fact; (2) traceability; and (3) redressability. *See Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020). For a perceived future injury to be imminent, the "threatened injury must be *certainly impending* to constitute injury in fact," "'[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in original).

Although the Plaintiffs concede in their Complaint that the Chief Clerk has not "s[ought] to enforce any cost of investigation," [R. 1 at pg. 8], the Plaintiffs argue in supplemental briefing that they suffered—and continue to suffer—from a "present and ongoing" injury in fact. [R. 79 at pg. 3]. Specifically, the Plaintiffs argue that by "liv[ing] for several years with the threat of the huge debt being enforced against them at any moment[,]" the Plaintiffs were injured and are entitled to relief. [*Id.* at pg. 2]. The Chief Clerk argues that the Plaintiffs' alleged injury is a "hypothetical" one, pointing out that the Plaintiffs "fail to allege an injury traceable to the action of the Clerk or an injury in fact." [R. 80 at pg. 4].

Fear of future harm, without more, does not an injury in fact make. *Buchholz*, 946 F.3d at 863 ("It is far from clear that a bare allegation of anxiety is a concrete injury . . . and as best we can tell, no such case [so holding] exists."); *see also id.* at 864 (noting that a plaintiff's "failure to allege anything other than anxiety makes us skeptical about whether he has established an injury in fact"). Indeed, it is not "enough that the future injury [be] reasonably likely to occur—the 'threatened injury must be certainly impending.'" *Id.* at 865 (quoting *Clapper*, 568 U.S. at 410). So, the Plaintiffs' assertion that they suffer from an ongoing "threat" of "huge debt being enforced

against them" is not enough to demonstrate Article III standing. [R. 79 at pg. 2]; *Buchholz*, 946 F.3d at 866 (holding that a plaintiff's "allegation of anxiety falls short of the injury-in-fact requirement because it amounts to an allegation of fear or something that may or may not occur in the future"). However, whether the letters sent from the Impeachment Committee to the Plaintiffs prove that future injury is "certainly impending" requires a closer look. [17]

To each set of Plaintiffs, the Impeachment Committee sent "complete lists of costs accrued by the Committee" that "[are] owed jointly and severally[.]" Letter from Rep. Jason Nemes to the Beshear Petitioners (March 12, 2021);[18] Letter from Rep. Jason Nemes to the Cameron Petitioners (March 12, 2021);[19] Letter from Rep. Jason Nemes to the Goforth Petitioners (March 12, 2021).[20] Although the Committee permitted "object[ions] to any individual costs[,]" it proscribed any "blanket objection to all costs . . . , as this is a mandatory process." *Id.* The Committee noted that absent individual objections, it would "submit the bill of costs to the Clerk of the House for further action[,]" and, in closing, requested all the Plaintiffs to "treat[] this matter with the seriousness and gravity that it deserves[.]" *Id.*

The Chief Clerk does not dispute that the Plaintiffs were sent these letters by the Impeachment Committee. Rather, the Chief Clerk emphasizes that: (1) the letters were, in fact, sent by the *Impeachment Committee*, not the Chief Clerk; and (2) "the statute does not empower the Committee to tax the costs[.]" [R. 80 at pg. 6]. In other words, the Chief Clerk acknowledges that the Plaintiffs received letters from the Impeachment Committee, but she argues that the letters should not impact standing because the Impeachment Committee lacks statutory authority to affect

---

[17] The Plaintiffs refer to these letters as "invoices" throughout their supplemental brief. [R. 79].
[18] https://apps.legislature.ky.gov/CommitteeDocuments/343/13297/Bill%20of%20Costs%20-%20Gov.%20Beshear%20(FINAL).pdf
[19] https://apps.legislature.ky.gov/CommitteeDocuments/343/13297/Bill%20of%20Costs%20-%20AG%20Cameron%20(FINAL).pdf
[20] https://apps.legislature.ky.gov/CommitteeDocuments/343/13297/Bill%20of%20Costs%20-%20Rep.%20Goforth%20(FINAL).pdf

any threat made in the letters. In the Chief Clerk's view, to show standing in the imminent injury context, a plaintiff must show that one with enforcement authority demonstrates an eagerness to certainly impend the injury. And, so the argument goes, since the Chief Clerk "has taken no action against any of the Plaintiffs, nor has she ever given any indication she would[,]" the Plaintiffs do not suffer from a certainly impending injury sufficient to justify standing. [R. 80 at pg. 7].

The letters at issue here are reminiscent of those in *Buchholz*. There, "[Gustav Buchholz] received two letters from [a] law firm . . . about two debts he owed to Synchrony Bank." *Buchholz*, 946 F.3d at 859. The letters "informed Buchholz that [the firm] was acting as a debt collector and provided contact information for him to either challenge or pay the debts. Buchholz [did] not dispute the debts, but he allege[d] that the letters made him feel anxious and fear that [the firm] would sue him if he did not promptly pay. So Buchholz sued [the firm]." *Id*.

Admittedly, the context differs between *Buchholz* and this case.[21] But the facts in both trace remarkably similar paths. Compare *Buchholz* with this case's facts: (1) the Plaintiffs received letters from the Impeachment Committee about fees owed to the House of Representatives pursuant to KRS § 63.070; (2) the letters provided an opportunity for the Plaintiffs to make objections to individual costs; (3) the Plaintiffs did not dispute the costs with the Impeachment Committee; (4) the Plaintiffs allege that the letters produced fear and anxiety that the Chief Clerk would tax the costs against them; so, (5) the Plaintiffs sued the Chief Clerk. *See* [R. 1].

Given the similarity of facts, it is worth considering the Sixth Circuit's "certainly impending" analysis in *Buchholz*. The Sixth Circuit determined that Buchholz did not suffer from a certainly impending injury for three reasons. *First*, the letters he received "d[id] not threaten litigation[.]" *Buchholz*, 946 F.3d at 865. *Second*, he did not allege "that he received any other

---

[21] Of course, this is to be expected given the people of the Commonwealth's unique statutory right to participate in the impeachment process. *See*, *supra*, n.13.

communications from [the firm] warning that a lawsuit was forthcoming." *Id.* And *third*, "most importantly," he did not "allege that he refuse[d] to pay what [the firm] says he owes." *Id.* Therefore, "[b]ecause Buchholz has neither alleged that [the firm] threatened to sue him nor that he refuses to pay his debts, [the Sixth Circuit] [could not] infer that litigation [was] 'certainly impending.'" *Id.* The Court is inclined to conduct the same analysis here.

In this case, the Plaintiffs do not suffer from a certainly impending injury in fact for at least four reasons. *First*, the letters sent by the Impeachment Committee do not threaten the future imposition of costs. Presumably, the letters were silent on this subject given the Impeachment Committee's lack of authority to tax costs—that is the sole power of the Chief Clerk. *See, e.g.*, Letter from Rep. Jason Nemes to the Beshear Petitioners (March 12, 2021) ("If no objections are filed, the Committee will submit the bill of costs to the Clerk of the House for further action.").

*Second*, the Plaintiffs do not show that they received any communications from the Chief Clerk—the sole defendant—indicating her intent to tax the costs against them.[22] In fact, they assert the opposite. [R. 1 at ¶ 23] (noting that "there has been no filing in state court to seek to enforce any cost of investigation, and, further, no final costs of investigation under K.R.S. 63.070 have been determined or assessed").

*Third*, the Plaintiffs have not alleged that they *refuse* to pay what the Impeachment Committee asserts they owe. *See generally* [R. 1] (the Plaintiffs allege that the fees are unconstitutional, but not that they will not otherwise pay the fees). "So far as [the Court] know[s],

---

[22] This could be explained by the fact that the Plaintiffs filed their Complaint on March 15, 2021. *See* [R. 1]. The Impeachment Committee letters indicated that, in the event no objections were filed, the bill of costs would be submitted to the Chief Clerks sometime after March 16, 2021 at noon. *See, e.g.*, Letter from Rep. Jason Nemes to the Beshear Petitioners (March 12, 2021). It is possible, then, that no action was taken by the Chief Clerk because the Chief Clerk was unaware of the bill of costs. Still, it remains true that the Plaintiffs fail to show that it is "certainly impending" that the Chief Clerk will tax the costs against them. Importantly, "it's unclear if the statutory scheme imposing costs has ever been enforced against any petitioner." [R. 80 at pg. 6]; *see* Chapman, at 284 (noting that "the General Assembly has in the past covered the costs of proceedings that have defaulted onto the petitioner").

[the Plaintiffs] might decide to pay [the assessed costs], warding off any prospect of [an injury in fact]." *Buchholz*, 946 F.3d at 865

And *fourth*, critically, the Plaintiffs concede that the Chief Clerk poses no threat of certainly impending injury. *See* [R. 79 at pg. 2] ("The statute does not limit the time when the invoice will lapse or become invalid. The clerk may force a petitioner to pay that invoice *at any time in their lifetime* or, presumably, enforce it against their estate once they are dead.") (emphasis added); [R. 59 at pg. 7] (conceding that "the Plaintiffs could remain liable 'on 5 days notice' long beyond the tenure of the present officials. Clearly the Plaintiffs might be faced with an enforcement action years from now, as there is no bar to future collection efforts."). Where there is no prior or imminent injury in fact, there can be no standing.

### E.

"Finally, a plaintiff cannot create an injury by taking precautionary measures against a speculative fear." *Buchholz*, 946 F.3d at 865. As held in *Clapper*, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. So, if the Plaintiffs intend to suggest that time spent litigating this case "amount[s] to an injury in fact," their argument is without merit. *Buchholz*, 946 F.3d at 865; *see* [R. 79 at pg. 13–14] ("Plaintiffs' fear and suffering over the past two years can never be repaid. The time the Plaintiffs had to spend missing time at hourly jobs, which created an additional financial sacrifice on their parts, can never be repaid. . . Plaintiffs brought this action and have prosecuted it for two years."). Absent a "certainly impending" future injury, the Plaintiffs cannot demonstrate standing in this case. Therefore, the Court must dismiss it.

## IV. CONCLUSION

The Plaintiffs brought this action against the Chief Clerk of the Kentucky House of Representatives, seeking declaratory and injunctive relief. [R. 1]. The Chief Clerk moved to dismiss the Complaint for lack of subject matter jurisdiction. [R. 58]. After ordering supplemental briefing, the Court agrees: the Court lacks subject matter jurisdiction because the Plaintiffs do not allege an injury in fact. Having considered the issues and reviewed the pleadings, and being otherwise sufficiently advised,

IT IS ORDERED that the Defendant's motion to dismiss [R. 58] the Plaintiffs' Complaint is GRANTED. This matter shall be STRICKEN from the Court's active docket.

Signed November 9, 2022.

Signed By:
*Edward B. Atkins* EBA
United States Magistrate Judge